May it please the Court, my name is Newell Smith, representing the LN to ALSEA. I'd like to reserve five minutes for rebuttal, please. Keep track of your time. Pardon me? Keep track of your time. Okay. There are two primary initial issues I'd like to address. The first is the significance of the CPA, or the Consumer Protection. Claim, and the Girard case, and in particular, the timing of when a duty to investigate might arise in a fraudulent concealment setting, as reflected in that case where you're dealing with statute of limitations. First regard to the Consumer Protection Action Claim, the sole basis that the Court put forward to not consider that claim was its false impression that it could only consider claims that had been raised in the prior summary judgment. It's clear under the case law we cited in Rule 59 that if there is new evidence, you can raise new claims. Well, as I recall, didn't the basis for this new claim stem from their work on another vessel in 97? Yes, that's correct. The work on the other vessel was known. The work on the other vessel was known, but all the records as to that work were suspiciously missing. They told us there was nothing in common between the two cases, and it was only a few days before the motion for summary judgment was actually decided that we got the transcripts of the depositions of the two other. I gather you weren't involved in the other case? No. No. That was completely other counsel, completely another case. They were stopping you from going to the other counsel and asking them all about what they were doing and their claims and everything else? No. As a matter of fact, that's exactly what happened. Virtually the day after they had these depositions, they called us and said, here, we have these depositions. You need to look at them, because they same thing happened. You were aware of the other case, correct? That's correct, Your Honor. Have you ever considered going to the counsel in the other case ahead of time? Well, Your Honor, there was no evidence. Of course, what was preventing you? You knew all about the other incident. As the district court said here, you knew about it. Correct. And there's nothing here to indicate that you couldn't have learned this additional information earlier on in proceedings. Your Honor, the — So why is it abuse of discretion? I have to give you a leap to amend it. After the district court had already granted summary judgment here? I'd like to say two things. First, the Court didn't even get that far. And I think we need to let the trial court initially address the — whether or not we had adequate notice. Well, let me ask you this. You seem to place a lot of stress on this thing, but you'd still have to prove that the defendant committed a fraudulent act. And you failed to do that on your main complaint. Why do you think you prove it here? Well, that's where I was going to get to, Your Honor.  It takes the case from being a dispute between two parties, in this case the two parties to a contract, to something affecting the public interest. And you look — You still have to prove fraud, don't you? No. You don't have to prove fraud? No. You have to prove a capacity to deceive. Prove what? A capacity to deceive. A capacity to deceive? Yes. The general public. That is the essence of proving that somebody is capable of deceiving? No, that the actions that they took in a generic way had a capacity to deceive substantial members of the public. I assume that you brought forward in the first case anything that might have shown that. I don't see it. I mean, I really don't understand how this would add one bit to what you already have done. Well, Your Honor, it takes it out of this argument between what Mr. Girding specifically knew and what their intentions were. And this is covered in the TESLA case. And it takes it more to — you look at these type of actions. If you have a situation with an overhaul contract and there are clear recommendations by the manufacturer to replace a specific ware item — Okay. That's something else I want to address. There's a lot of confusion on the manuals. There's three manuals. There's an owner's manual. There's an operation and maintenance manual. And there's a guideline for the reuse of parts. The only manual that was addressed in their motion for summary judgment was the owner's manual. The owner's manual does not contain that information until page 117, where they say, read this if you're going to be overhauling your engine yourself. Now, part of the problem is the court got confused. They went through the guideline for reusable parts, which does, on its first page of text, say, in bold print, replace the bearings. And — As a mandatory recommendation? No. Mandatory? We recommend — We recommend. Right. And the reason you recommend is because it's going to fail in probability — not might, but in probability will fail before you get to the next overhaul. And we're talking about a vessel that's going to the Bering Sea, where you don't just call out the repairman. But anyway, the court got confused and thought that this was one of the manuals that Tim Gerding had. It didn't. The manual where it's right out there in front in bold letters, Tim Gerding didn't have. And that was some of the confusion with the court, which I think led us where we are today. And what about the third manual? The third manual is the operations and maintenance manual, which was aboard the vessel. And it contains the same language as the owner's manual, but on page 124. It wasn't — You think people shouldn't read the whole thing. They should stop at page 10 or something. Well, Your Honor, you know, there are situations where you have, like, a guy that changes his oil and changes his spark plugs, and he gets the owner's manual. That owner's manual says, if you're going to change out your own brake pads, then you should be aware of the following. And this is way back at the end of the manual. He goes into his automobile dealership and says, overhaul my brakes. And the guy calls back and says, well, you know, only one set of the pads is really worn, so why don't we just replace that one set? Save you some money. The guy says, great. Turns out that the manufacturer made it clear to the automobile dealership that you replace both pads or the car's going to bear. You know, your situation seems appealing to me if we were — the argument would be more appealing if it was someone who owned their car and was taking it to a car repair and was relying on the car mechanic, auto mechanic, to tell him, well, the bearings need to be refilled or whatever, because that person doesn't have the level of knowledge and understanding of their own vessel, as we would presume that both your captain and you as a — your client as a sophisticated company that, you know, owns this vessel and operates this vessel would know. The argument is more appealing if you're — if we weren't dealing with two very sophisticated commercial enterprises. I think on a — to some extent it might be, but it really isn't, because there's — an engineer on a fishing vessel is kind of a misnomer. Basically, he's a guy that just checks the oil levels and changes filters, and that's about it. He's not a specially trained mechanic that knows how to repair an engine. It's more analogous to the guy that just changes his oil and checks his oil. I think that is kind of a misconception here, that you have, like, on a fishing vessel, you have somebody that has training. It's not like on a merchant vessel, where to be an engineer, you really have to be something. This guy basically — our particular fellow, his degree was in forest engineering. There's no specialized training. You're looking — now, we're looking at the exceptions to take you out of the limited warranty contained in the work order. And don't you have to apply an objective standard? We're not supposed to look at what, in fact, Captain Groening did do or what, in fact, he did know, but what he should have done and what he should have known. Okay. That — I'll segue that into the Girard case. In fraudulent concealment, all the Washington State court cases say, in the situation where you're relying on somebody with special expertise, you don't — The Girard case did hold a duty to investigate, but you have to put it in the context of that case. In that case, they were applying a herbicide to plants. After they applied the herbicide, the plants wilted. The manufacturer and the plier came out and said, hey, this is just cosmetic. You have nothing to worry about. A few months later, they harvest the plants. They're all deformed. The court held that there was a duty to investigate not when they bought the herbicide, not when they applied the herbicide, but once they had something go wrong and they had somebody to point to. That would be analogous to here. There would have been a duty to investigate if they developed an engine knock, brought in the NC people, and the NC people said, well, that's not that big a deal. Maybe it'll go away. Under the Girard case, there, there might have been a duty to investigate, to go back and say, hey, what did the manufacturer recommend on this? So it's clear under Washington law, this duty to look at the — to look further. And a statute of limitations case is triggered once you have an injury and once you have somebody to start looking at. So here, I think it's — two things are clear in Washington law. You look to the specific knowledge of that person in fraudulent concealment, not the general knowledge of whether or not he has some knowledge of mechanics. This is like the Fison's case and the doctor knowing something about that particular medical procedure, but not — I mean, about the medical condition in general, but not that particular procedure. I lost my train of thought. Can I ask you a question? What is your theory as to the motives that they would have concealed it? The result was they got less business rather than more business. Why would they have done that? This is what happened. And you can only put it together kind of through the footnotes. They did an in-frame overhaul. According to Mr. Bruno, it was his understanding that an in-frame overhaul, you don't have to replace the main bearings. That's what he testified to in his deposition. I don't think you're answering my question. What was their motive? Well, I'm saying that the motive here was that, sure, they could have made more money, but it was more hassle. More what? They would make more money because they'd have to work more. Is that what you're saying? Well, okay. First, it's clear that under none of the law that we have to show intent. Well, you commit a fraud, you usually have a motive for doing it. And I didn't see what the motive is yet. Can you tell me the motive? Your Honor, we don't have to show motive. No, no. If there is a duty to disclose created by a special relationship, we don't have to show intent, either under the Consumer Protection Act or under fraudulent concealment. What happened here is they bungled it. He thought that if you did an in-frame overhaul that you don't have to replace the main bearings. He didn't go back. He didn't read the manuals. And then they did this whole thing after the fact of their story keeps changing. They say, well, Tim didn't want to replace it because he had to go fishing. We didn't replace it because it was an in-frame overhaul. We didn't replace it because Tim didn't want to spend the money. It seems like your whole argument is that they were negligent. And you're just out of luck. You've contracted out of that. No. It would be negligence if we said that, well, the standard in the industry is that you replace main bearings. It becomes fraudulent concealment in breach of the Consumer Protection Act when there is a manufacturer's recommendation and manufacturer is counting on the repairer to communicate that recommendation. Why is he counting on it when he gives it to the owner? He gives it to the owner in the context of the owner doing his own in-frame overhaul. If the owner steps into the shoes of the repairer, then he's warned. But in this case, that didn't happen. And you've really got a very stretched out theory to maintain the great persistence over quite a long time. Okay. Your Honor, these vessels go off into the Bering Sea, and they don't come back for months, and they're away from everything. If you look at the Pan-Alaska case, it's NC Machinery again. And in that case, the same thing happened. There was a notice from the manufacturer that they ignored. Now, these vessels go into harm's way. And under the maritime law, the mechanic has a duty, an affirmative duty, to make sure that vessel leaves the yard in a safe condition. If he doesn't do the minimum in an overhaul contract of either following their recommendations or at least informing the customer, then he hasn't fulfilled that duty. And there has to be some kind of protection here. Or you ought to make a different contract. Pardon me? They ought to make a different contract if that's what they want. Well, Your Honor, the contract here was that there not be any defects for six months. And in this case, there was a defect in the first six months. They didn't replace the bearings. They said they would replace the bearings if required, and they were required to be replaced. It was right there in bold type in their reusability guidelines. But you're shifting there. You say it's required. It's a recommendation, is it not? Well, I think. Isn't that right? It's just a recommendation. Is it a recommendation when they say the engine's going to fail if you don't do it? They're saying it's a requirement. Is that your condition? In the context of this, it is, because it's just a choice of words. They can't. A manufacturer can't require you to do anything. All they can do is recommend. They can't force you to do something. But if they recommend that you do it, and if you don't do it, the engine's going to fail, I'd say that's a requirement. May it please the Court. Your Honors, my name is Todd Rosenkranz, and I represent Tractor and Equipment Company. At the time of the events that give rise to this lawsuit, they conducted business in Washington and Alaska under the trade name NC Machinery Company. And this case is about NC's good-faith efforts to provide quality repairs. This case is not about fraud. It's not about any sinister motive. What needs to be stressed up front and throughout these proceedings is that the incentives here are exactly opposite from a fraud case. NC had every incentive to change the bearings, to sell new bearings, to sell their time in putting in those bearings. They had nothing to conceal. They had nothing at all to gain by the alleged concealment that is claimed to have gone on here. There's no evidence of any sinister motive at all, and that the label fraud simply does not fit this case. I think the panel has already drilled to the nub of this case on the concealment claims that they are trying to assert to get around, the exculpatory clauses in the work order. And even if you start with the Consumer Protection Act claim and assume for the sake of argument that that was already in the complaint. Is that in the case or not in the case? At the time the motion for reconsideration was filed, had Rondes amended the complaint to add a Consumer Protection Act claim? They did it simultaneously. At the same time they filed a motion for reconsideration, they filed a motion to file a second amended complaint. And it was in the second amended complaint that for the first time the Consumer Protection Act was put forth. So I think technically it was not in the case at the time. And that was, that CPA claim was based on the Samson Schiff incident, a lawsuit that had been pending for a while. That's correct. Okay. All right. And getting back to even if, even if the CPA claim would have been before the Court, what you still need in, for a CPA cause of action is an actual concealment. Now, it is true that you don't need for a CPA cause of action subjective intent to deceive like an intentional tort, but you still need an actual concealment to have occurred at bottom. And just one part of this, the factual scenario that I'm not quite understanding is the mystery surrounding the mileage and how that would have affected a recommendation to overhaul or replace the bearings at the time that the engine was overhauled. There is some confusion on that score, and I think that it, the background is the following.  At the time of the overhaul, it said it had, I believe, 4,163 hours. And there was confusion on the part of the mechanics, and we contend also on the part of the vessel owners, as to what the true hours were. Judge Kunauer, he concluded that there was a factual dispute as to what the vessel owner told the NC mechanics about the actual engine hours, but that dispute was not a material fact that precluded summary judgment, and notably, the vessel owners also do not argue in this appeal that that was a material fact. But I, we believe that this Court could correctly find that there was no dispute, because we have consistent testimony from two NC mechanics that they believe and were told that the hours were far less than they actually were, far less than the overhaul period. And on the other hand, we have the captain of the vessel claiming that he doesn't remember the conversation. But, you know, he would assume, in hindsight, that he would tell them X, Y, and Z. Well, that doesn't really raise an issue of fact, because he's speculating. He's assuming. Well, wouldn't the meter, I mean, okay, so why would the meter state more hours rather than less hours? Was it just broken? Right. The meter reflected less hours. Reflected less hours in the reality. That's correct. Was it broken, or is there some incentive to have a meter reflect less hours, like your automobile mileage thing when people want to go sell their car? In this case, the only testimony is that it was broken. I don't think there's any indication that that was an intentional thing. I think that it probably just was broken. I thought the original one had broken, and they replaced it with a second one, and the second one had the mileage. That's correct. Actually, that's correct. The first one was broken, and at some point it had been replaced. And so there was an interim where the meter was broken. That's right. And then they put a new one on. So the new one started at zero. So there's nothing nefarious about that whole thing? No, I don't think so. But it does color the situation on, particularly when you start talking about gross negligence and good faith. What was the understanding of the condition of this engine and the hours on the engine? But ultimately, I believe Judge Kunauer was correct. That's not really a material fact. And he was absolutely correct in dismissing the concealment claim. And all of their claims are some permutation of alleged concealment of the manufacturer's recommendation. But it's undisputed in this case that that recommendation was in two manuals, the owner's manual, the operation and maintenance manual. It was aboard the vessel when they purchased the engine. They purchased the engine in 1990. It came with the engine. It was aboard the engine for five or aboard the vessel for five years and thousands of hours before this overhaul occurred. In his deposition, Captain Girding acknowledged that he referred to those manuals for maintenance. And in fact, he actually said at one point under questioning that he may have even read the very recommendation about main bearings, and he was not prepared to say that he definitely had not read that. But it's definitely undisputed that he referred to those from time to time. It's absolutely incorrect, and there's no evidence in the record to suggest that Judge Girding did not refer to those manuals.   He did not refer to the Caterpillar guidelines for reusable parts. No one ever made that argument, and his opinion doesn't reflect that. The only arguments that were made was that the recommendation is contained in the owner's manual and in the maintenance manual, and Captain Girding admits in his case, and I think that the facts there are strikingly analogous to the facts here. In that case, we have a farmer who is an experienced potato farmer. And in our case, we've got farmers of the sea. And in both cases, we've got a dealer of another manufacturer's products. And one claim that the farmer made in that case was that the dealer concealed the manufacturer's recommendation. Well, the clean point that the Court made was that there was no concealment because that recommendation was right on the label. And that fact alone was enough as a matter of law to dismiss the concealment claim. It's exactly analogous here because it was in the manufacturer's literature. And everything else that NC did in this situation was fully disclosed. There was never any agreement that the bearings would be automatically replaced. The face of the work order said the bearings would be inspected. It was made clear by the invoice that the bearings were reused. So there was this maybe would be a fraud case if there was an allegation that we tried to pass off old bearings as new bearings, that we charged them for new bearings. That absolutely is not the case here. There's also – there's two other separate and independent grounds to dismiss the concealment claims. Judge Kunauer relied on one of those grounds. And that ground is that as a matter of law, if based on the buyer's experience, the buyer should have inquired further, or if the information was readily obtainable, there's no concealment as a matter of law. And the undisputed facts here show that they – that these were sophisticated, professional, commercial fishing entities. Captain Girding has spent his entire adult life in the fishing industry. He had a four-year degree. He was responsible for maintenance under the partnership agreement. And he spent his life on this boat. He testified that he spent about 80, 85 percent of the time the boat was running on this vessel. That adds up to, if you use their estimate of amount of time, of thousands and thousands of hours that he lived and breathed with this engine. And he was the engineer and the captain. He also testified in his deposition that he knew the function served by main bearings, that he knew that they were wear items. They had to be replaced periodically. He had the manuals on board. He referred to them. And it was perfectly clear that the bearings were inspected and reused. And in this situation, again, reference to the Girard v. Quincy Farm case is exactly on point. There in that case, they also referenced a second independent reason to dismiss the concealment claim. And that was because the Court said the experienced potato farmer had a duty to familiarize himself with the manufacturer's literature that came with the product. In that case, it was a label. In our case, it's the manuals. And even cases dealing with concealment as a standalone cause of action, as opposed to concealing concealment having to do with tolling statute of limitations, maintain this requirement that if you have sufficient experience, you have a duty to And in this case, Mr. Girding, he didn't ask how long the bearings would last. Hence, he made no representation about how long the bearings would last. How many meters after the in-frame overhaul did the vessel accrue before the fire? But if we go by the estimate that the owner's estimate that in June of 1995, there was 15,000 hours, the incident occurred, I believe, in September 1997, 26 months later, and the estimate of the hours was, I think, 22,000 hours. So it went another two years and 7,000 hours. So, you know, if we assume for the sake of argument that their theory of how the failure occurred is true, which we dispute, but that's not an issue here. It still lasted for over two years. There's also a third separate and independent basis to dismiss the concealment claims. Judge Cunar didn't have to reach this because the basis he used was sufficient on their own. But this gets back to this Court's decision in the Royal Insurance Company v. Southwest Marine case. That's the latest pronouncement on the enforceability of exculpatory clauses in ship repair contracts. And in that case, the holding was that everything can be disclaimed except gross negligence and intentional misconduct. And specifically in that case, the Court dismissed the negligent misrepresentation claim and allowed to proceed only the intentional misrepresentation claim. And there's absolutely not one whiff of evidence of subjective intent to deceive in this case. And this is where you do get into the heightened fraud standard. You have to have actual subjective intent to deceive, and it's got to be proven by clear, cogent, and convincing evidence. And this is a requirement that the vessel owners in their arguments have consistently ignored. It's undisputed that upon inspection, the bearings were in excellent condition. They looked like they were new. They came out of the box. There's no evidence that the mechanics misrepresented the condition or even were honestly mistaken about the condition. And I think it's also notable that in his deposition, Captain Girding said that he didn't think that he was misled or lied to in any way. So there's not a single shred or piece of evidence that would give rise to a triable issue of subjective intent to deceive. Going back just briefly to the Samson-Mariner situation, I think I've already covered that even if the CPA claim would have been before the Court, he could have dismissed it because there's no concealment. But the other requirement is that in the exercise of reasonable diligence, that this information could not have been discovered earlier. Well, it could have. It very easily could have. And the suggestion that there was any sort of underhanded dealing in discovery is absolutely false. It simply did not occur. The cross-pollination between these two cases is very striking. They were filed at the same time. They shared experts. There was three experts in each case. They were identical in each case. The failed bearings in each case were kept at the business of the common engine expert. He had the bearings for both engines. I think that the Samson-Mariner case was a little bit distinguishable because they also made the claim that there was fuel dilution, that something happened to a fuel injector that caused 21, I think, 21 or 23 percent fuel dilution, massive fuel dilution, and there was testimony from their engineer that that would have failed the bearings regardless. So there was significant cross-pollination between the two cases. And the vessel owners in this case, they never propounded a single interrogatory that said, tell us who were the mechanics who did the job in the Samson-Mariner case. They never propounded interrogatories. The documents they say that were slow to be produced didn't contain that information. And the fact they were produced more than a month before discovery closed, they also didn't contain that information. They never asked informally who those mechanics were. So if they would have taken those simple steps to ask those questions, they would have been told the identity of the mechanics. There was no documents withheld. That contention is simply not the case. And the district court also correctly concluded that there is no tribal issue of gross negligence in this case. And I think where the vessel owners' shortcoming in their argument on gross negligence is they just make conclusory statements. They say, well, this is gross negligence. But they don't really provide a useful analytical framework for distinguishing between ordinary negligence and gross negligence. And you've got to have that. Otherwise, if you just make an allegation of gross negligence and that gets rid of the That's the exception swallowing the rule. It's not a useful distinction to make a land versus sea distinction either. This is the maritime context. If you had a tribal issue of gross negligence any time there was a defect that manifested itself at sea, again, that would swallow the entire rule and eviscerate the entire doctrine. But I think the proper guidance is, again, in the Royal Insurance Company case. And there they define gross negligence a couple of different ways, including intentional failure to perform a manifest duty and extreme departure from the standard of reasonable care. And Judge Kunauer got it exactly right when he said that for there to be a tribal issue, NC would have to fail to replace the bearings despite an express request from the owners. Now, that would be an intentional failure to perform a manifest duty. And that simply did not occur in this case. There are other cases that say, well, the difference between ordinary and gross negligence is a point on a continuum. And if you look at the Washington cases, and particularly there's one called NIST v. Tudor. It's a 1965 case. And that case involved a driver of a vehicle taking a left-hand turn into oncoming traffic. And how the Court characterized that was the failure to exercise even slight care in the face of imminent, perceptible, and obvious danger. So there's got to be an extreme departure from the standard of care, and there's got to be a highly probable and imminent danger. And there's no evidence that would fulfill any of that in this case. Before this failure, there had been no prior failures under this scenario. This had been a practice that they had used with other vessels, and the mechanics testified that in their experience, if the boat was well maintained, that the bearing you could get more life out of the bearings. There was never any indication that this was a particularly troublesome practice. And it's not as if they didn't give any thought to the bearings at all. They inspected them, and they were excellent and in brand-new condition. The risk here also wasn't imminent. The manufacturer's recommendation, as the Court noted, is simply a recommendation. And what the recommendation is, is that these probably won't last to the next overhaul. They probably won't last 36,000 hours. Well, if you apply that to this case, using the vessel owner's estimate, that's a recommendation saying, well, this probably won't last another 21,000 hours over the next six or seven years. Well, nobody made that representation here, and the vessel owners have to take some responsibility in keeping track of the condition of those bearings. Thank you. Thank you, Mr. Counsel. Mr. Smith, you have a few minutes left. Pardon me? You have a few minutes, three minutes left. Okay. First, I would like to clear up a couple of factual issues. The whether or not there were 15,000 hours on the engine, that's disputed as the fact. I think since this is a summary judgment, we have to assume that there was 15,000 hours on the engine, and everybody knew that. As to the way these overhauls work, there are two different kinds of overhaul. There's the major overhaul that's every 15,000 to 18,000 hours, and then there's a top-end overhaul, which is every 7,000 to 9,000 hours. What happened here is that at the major overhaul, the bearings were not replaced. On both engines, they came in for this intermediate overhaul, which is at the half-life of a major overhaul. In both cases, the engines blew up shortly after that top-end overhaul. In both these cases, that was the second opportunity for them to have informed about the need for the new bearings. But more importantly here is I perceive some of the justices are looking at the terms fraudulent concealment for what they appear to say. Fraudulent concealment is not about fraud, and it's not about concealment in this kind of case. Fraudulent in your mind says intent, doing bad things. Under Washington law, if there is a special relationship, there is a duty to disclose. There doesn't have to be any intentional concealment. There doesn't have to be intentional wrongdoing. In the Cunningham case, it was a question of, you know, the records were available. Nobody tried to hide the records as to what the attendance was at the theater. And the same thing on concealment. You don't have to hide the stuff. You just don't disclose it where you have a duty to disclose it. So I'm very concerned that this be just a summary affirmance. I think that you really have to go back and look at the cases and what is required. Because I don't know why you're assuming we haven't read the cases. Well, because I get these questions on having to prove actual fraud. It's part of the points that you feel would persuade us of the merits of your case instead of assuming we haven't read the law and the briefs. I apologize all over. And counsel is saying that we have to prove all the elements of common law fraud. I'm just worried that the wrong impression is being engendered here. And I do not mean to say the Court hasn't read the briefs. What I mean to say is that the term fraudulent concealment creates an impression that is not backed up by the law. And again, counsel says Gerard is dispositive. Gerard is dispositive. Then look at it and look at the timing. Gerard does not say that there was a duty to investigate at the time that they applied the herbicide. All right, counsel. You've exceeded your time. Thank you very much. Thank you. All right. Rondi vs. Tractor and Equipment Company is submitted. Tokyo Marine Fire Insurance vs. USTA. We've received word that the case has been settled. So we will take a United States vs. Reese, Albany.
judges: Wardlaw, Noonan, Paez